Mr. Beeger, Mr. Beeger, Mr. Beeger, Mr. Beeger, come forward. We're happy to hear from you. I represent the appellant, Juan Lara. In December of 2009, or actually in 2008, Juan Lara was sentenced to 20 years in prison for aggravated sexual battery. 17 years of that was suspended. He completed a three-year term in December of 2009 and then began a 20-year term of supervision. He was ordered by the state court to attend and complete sex offender therapy program. He was ordered to submit to polygraph testing, which required full disclosure of past sexual misconduct. And he was ordered to allow the sex offender treatment provider unrestricted communication with the probation and parole department. These were conditions of his supervision. Failure to abide by those could result in revocation and sentence him back to the remainder of his sentence. On April 2010, he underwent a polygraph examination and in that polygraph examination admitted to two murders and four rapes and also some other offenses. On July 1st, some two months afterwards, he signed a waiver agreeing to waive rights of privacy and confidentiality. Then later in December of 2015, he was sentenced to a maximum of 10 years for failing to register. I don't object to the district court's actual imposition of the sentence. So what you object to is the admission of the evidence, the admission of the statements with respect to the murders and the prior sexual assaults. Well, I object to the court admitting that and considering that and sentencing him, but I understand. I mean, but that's your objection to it. I don't agree to the 10 years. If the evidence, what I'm saying is if the evidence were held to be admissible, you would have no further objections to the sentence. I think the sentence would be supportable if the evidence were held to be admissible. Okay. Okay. So in any event, he was sentenced to a maximum of 10 years and the court granted a variance to the upward because of this evidence. The first issue that was raised was whether the psychotherapist patient privilege was waived. It was held that it was waived because, in part, it was disclosed to a third party named Brian Hall and because of the waiver that was signed a couple of months after the statement. We contend that the privilege was not waived because, one, for three reasons. One, Brian Hall was not an unrelated third party. He was a Virginia Department of Corrections officer. He was, in fact, Laura's primary supervisor. When Laura made his incriminating statements, that information was immediately reported to him. He testified. Hall testified. There was a conversation in the car, I guess, because he was carrying Laura back and forth, and it's not exactly clear what he asked, but he probably asked something like, did you really make those statements? And Laura said, yes, he did. But Hall said that if Laura said he was lying during that polygraph examination, he would have reported it. And the reason I bring that up is that this was not a casual conversation because Hall was on duty. Were the statements made to Mr. Hall in the car? I mean, the question is whether there was a voluntary waiver. And were the statements made to Mr. Hall in the car in some way compelled? Was it in response to questioning or interrogation or what have you? Or was it in the course of a conversation because you can't expect or be unrealistic for the prison supervisor, and the person they're supervising, not to have conversations? In other words, many times when police officers take someone back to the station house, or many times when someone is in a car being transported by U.S. Marshals or whatever, they engage in conversation. And that's not an impermissible happening. But if he's being grilled or threatened with consequences if he doesn't come forward or whatever, then that undermines the voluntariness of it. Now, what was the setting in the car? There's no indication that Laura was being grilled by the officer or threatened that if he didn't have conversation with him, he would be in trouble. However, Laura was under a court order to have unrestricted communication with probation and parole. Well, and don't the terms of that order, Mr. Beeger, really work against Mr. Laura in this case? Because in the order that he signed, the court's order he signed in August 2009, so six months before all these other incidents in question, he signed the statement saying that he will allow the sex offender treatment provider unrestricted access to the probation and parole office and any other information deemed necessary to protect the community. So as a condition of probation, he's already agreed to unrestricted access and the use of anything. And the Supreme Court has said that that is a valid condition of probation to make these requirements as a condition that the prisoner makes in return for his release under supervision. So I don't understand how we go past that step, the step of what he signed on August 6, 2009. Why are we even talking about consent and waiver if in the appendix at 533, pursuant to the order of the Circuit Court of Grayson County, he signed this? It seems to me that that's almost game over. Could you tell me why it is? Our position was that in order to get a suspension of the 20-year sentence, he had to do that. Exactly. And so he's waived anything. And he did it back in August 2009. So why are we even worried about when he signed the consent in front of Mr. Flora or what he might have said to Mr. Hall in the car if six months earlier he already said, okay, I want to be released. I'm willing to, as a condition of release, give them access to everything. Because I believe that from the very start it was involuntary. It was either do that or you stay in prison. Did the Supreme Court address that, though, in Minnesota v. Murphy? In dealing with conditions of probation and what's compulsive and what's not? Didn't they say that this was? I think Minnesota v. Murphy turned on whether the Fifth Amendment was properly raised. And if it wasn't raised, it was waived. Right. But didn't the Court make comments that this is something that is fairly routinely done? Well, I. That the probation is a privilege. Probation is a privilege. It's not a right. And I think we do have case law in the Fourth Circuit, although I don't have it right at hand, that it's a privilege and that in return for that privilege you give up certain things. In return for not being incarcerated anymore, you give up certain things. And that's part of the deal. Well, I don't think that you give up your Fifth Amendment right to not be compelled to testify against yourself. Well, he agreed to allow the probation officer any, to receive any information concerning his participation, any other information deemed necessary to protect the community. And it seems to me that murders and rapes fall right in there. You know? Well, they might. Okay. Well, it sounds like we just have a disagreement on that. Right. Because I believe it was all involuntary because he had to do that in order to get out of prison. Isn't it more likely that something is voluntary if it's granted in search of a benefit, if you receive positive consideration for it? In other words, this was not something that was extracted under threat or anything. What my colleague Judge Keenan is talking about is an agreement that was made in search of a considerable benefit. And isn't that a universal way from something that's made under duress or interrogation or some sort of coercive pressure? I understand the points that both of you are making. But a universal way, either you do this or you go to prison for 17 years, it does not seem to be a universal way to me. Well, but the 17 years was a prison term imposed by virtue of law. And that's just a fact, and there's nothing wrong or illegal about the 17 years. I mean, this is – but it just seems to me that the Fifth Amendment privilege, at the heart of it, is a concern about compulsion. And the psychiatric privilege is a concern about doing something without the patient's consent. And so both of them are – they're distinct issues, but they're also related. And if somebody does something as part of a deal and in search of a considerable benefit, doesn't that diminish any suggestion of compulsion or any suggestion that we are overriding a privilege contrary to the patient's consent? In other words, both of the roads lead to Rome. And you don't want to deprive somebody of the right to make a deal in their own interest, which he did. And I think my colleague's comments are really on point. Well, I don't – the solution would not necessarily be to deprive him of his right to make a deal, but the solution would be to warn him that if he makes incriminating statements, that he could be prosecuted for – because of that, for further crimes. And the case, Mr. Bieger, I was looking for was United States v. Glick, the Fourth Circuit case. I'm sorry, I didn't have it right at hand. But that's 408 Federal 3rd 162. And it says that the defendants routinely waive a large number of rights, including constitutional rights, in order to reduce their time in prison, and that such waivers are not considered involuntary because they desire to do so to, you know, gain freedom from incarceration. Okay. Okay. Well, the other issue that is the Fifth Amendment issue, which is related, but I don't believe that in his proceedings before the Grayson County Court that he waived his Fifth Amendment rights. And here he had to undergo a sexual treatment program that required full disclosure of past sexual misconduct, exactly like it was discussed in the Barr case out of the Ninth Circuit. He got a good deal out of it all. I mean, he would have been just sitting in prison had he not agreed to the treatment program. And there's nothing wrong with the treatment program. It's a good rehabilitative mechanism. He got a good deal. He was out on probation as opposed to sitting in jail in a prison. Okay. And so, you know, that's, again, it seems hard to blast the government for something that works so considerably to this gentleman's benefit. That's all I'm saying. And I don't see any evidence in this record of coercion or grilling or the kinds of things, you know, if Hall had said something like, all right, if you don't talk to me and tell me everything, you're losing your probation. And if you don't, you know, that kind of thing. That might put a different cast on the case, but that didn't happen. Well, the therapist, Rudy Flora, testified that if he had refused to take a polygraph, his probation probably would have been violated. If he hadn't signed the waiver, he would not have been admitted into the program. That wasn't communicated to him. No, the court orders required him to do it. If he didn't abide by the court orders, it was clear that he faced revocation of his probation. All right. Thank you. Okay. All right, sir. Mr. Jane, come on up. Thank you. Kevin Jane on behalf of the United States. Now, I think the court has picked up on sort of the key areas in these two issues, starting with whether the psychotherapist's patient privilege applies. There are a number of ways for this court to affirm the district court. Now, Judge Jones focused in on the voluntary waiver that was signed in this case, but as the court has noted from the get-go in August of 2009, Mr. Lara agreed that there would be unrestricted communication between the sex offender treatment program and probation. So right out of the gate during conditions of probation, he agreed that there would be communication between these two entities. In addition, when Mr. Lara actually entered the sex offender treatment program, he verbally agreed with or he did not object to Mr. Flora's direction that there would be no confidentiality in their discussions. Doesn't that get a little dicey to rely on that? Because Mr. Flora, we know, was inaccurate about the waiver being signed at the intake. So what you're doing, it seems to me, is asking us to rely on part of his testimony but not rely on another part. Why would we want to do that here? Well, Your Honor, as our letter to the court tried to highlight that there's this date and the waiver may or may not have happened on a different date, I don't think that's clear from the record. Well, doesn't the signature show July rather than April? It does, Your Honor, and that's why we highlighted it for the court. But I don't think it undercuts Mr. Flora's testimony that during his discussions with Mr. Flora, he told him that there would be no confidentiality in the discussions. I don't think it undermines his entire testimony just because there's a possible discrepancy in the date. Mr. Flora was very clear that he told Mr. Lora there would be no confidentiality, consistent with the conditions of probation, consistent with the waiver, consistent with the consent that was signed in the case. So that testimony makes sense in light of all these documents. And even if the court were to find there wasn't a voluntary waiver written or a waiver, of course, there's these discussions that Mr. Flora had with Brian Hall, who was the probation officer in the case. As Judge Wilkinson noted, there was a casual conversation. How much overlap was there in his conversation with Flora? I mean, in his conversation with Hall in terms of these admissions? How many of these things did he talk about with Hall? The testimony isn't precise on that, Your Honor, but the case law allows when we talk about implied waivers, the case law allows for when a person that normally has a privilege under the psychotherapist patient privilege, once you discuss the substance of those communications that you had with your therapist, it opens it up to the entire subject matter. But regardless of that, Mr. Hall indicated that he discussed the murders and he discussed the substance of what was told to the polygraph examiner. And clearly those are the incriminating statements that the government, the focus of what we presented to Judge Jones at sentencing, and was part of his basis for the upward variance in this case. How did Lara, how was Lara able to list in such detail all his past sexual engagements by date, number, age of the person and everything? Did he have a diary or something? That's an interesting question, Your Honor, and Judge Jones keyed in on that. Mr. Flora indicated that in dealing with offenders such as Mr. Flora, that there's sometimes a, and I forget the exact language, but fascination with their past sexual acts, and they're able to recall a great amount of information that perhaps a normal person. But did he keep a book of every time he had some kind of sexual encounter? I mean, he gives this precise number. I mean, has he got a diary or a book or something that he's keeping of every sexual encounter? Of course, Mr. Flora didn't testify, so I didn't get a chance to cross-examine on that point. But there's no indication he had a diary. I don't know if he did or not, Your Honor. But he did come up as truthful in his polygraph in making these statements. What Mr. Flora said is sometimes somebody may get the details not perfectly accurate, but if the general statement is true, they'll come up as truthful on the polygraph. I mean, he's had 77 sexual contacts and 44 were with female minors. You know, it seems to me at a certain point you kind of lose count. Yes, Your Honor. And Judge Jones questioned Mr. Flora on this point. Mr. Flora didn't think that that was unremarkable. In his experience, this is something that happens with these type of offenders. I don't know if it's a fixation or if he had a diary or what the situation was, but certainly he knew a great detail about his past sexual acts, including those that would be considered crimes, Your Honor. So one of the things that, you know, I thought reading the statement about all these sexual encounters, it almost seems like this is something this guy's very proud of, all the number of whatever encounters, conquests, or however he sees them. And I said, okay, my gosh, he can't wait to tell people about them and brag about them. You know, it's just look what a macho guy I am and look at my record. Have you got anything to match to mine? I mean, it almost seems like it's a case of braggadocio. It's sick. I mean, it's just sick. It's like something that he's just really, really proud of. That didn't sit well with Judge Jones, did it? No, I don't think it did, although Judge Jones was – I don't think that sort of surprise infected any of his reasoning. But it surprised accounts for the government and Judge Jones. And as I said, Mr. Lohr didn't testify, so I wasn't able to cross-examine on these points. But, you know, certainly Mr. Lohr made the statements that came up as truthful. And whatever his motivation was, he didn't – he made the statements to – in the polygraph to Mr. Hall, a third party, and to Mr. Flora. And whether it was bragging or if he catharsis or whatever. Mr. Hall was never in the polygraph. He was not there. Was he in the polygraph? He was not, Your Honor. And he's not part of the treatment program. I mean, he's in charge of transporting him. But this whole question about whether he's a related or unrelated third party, he was present, as I understand it, at the intake interview. But he wasn't present at the polygraph, and he wasn't present – he's not a part of the regular treatment program. He's not administering the treatment in any way. No, Your Honor. Clearly in the Bolander case, which says that the court must strictly construe privileges, he was not part of the diagnosis and treatment. But the threshold question, it comes back to what my colleague raised earlier, and that is the whole deal was in order to receive this substantial benefit, we have to be in a position to make this treatment program work. And probation needs to know what's going on and whether this treatment program is likely to be successful because that has a lot to do with how probation can do its job. They need that kind of information to know whether this guy has really turned a corner or whether he's going to go back to old ways. So you can see why there was a waiver of confidentiality to it because the success of the treatment program would depend upon some sort of communication between the penal authorities and the treatment program and to how successful it's becoming. That's correct, Your Honor. And Judge Keenan cited the U.S. v. Blick case. There are other cases in the Fourth Circuit that stand for this idea that in exchange for a benefit, you can give up, you can make incriminating statements. That's the threshold point, isn't it? I think it's clear that this happens every day, and there's no question under the law that, and I didn't cite in my brief, but the United States v. Frazier case, 971 F. 2nd, 1076. It's a Fourth Circuit case from 92. That example was whether there's a Fifth Amendment issue in making incriminating statements at a plea in exchange for a better sentence. In the court, obviously, this happens every day. The court rejected that notion that there's any problem with that situation. You get a benefit, a lower sentence in exchange for your incriminating statements at a plea. Anything further? Unless the court would like to ask any questions on the Fifth Amendment issue. Let me ask my colleagues if they have any questions about this. Actually, I have just one little mechanical question. How was this information transmitted back after the polygraph examination and the treatment program had this information in their possession? Did they then contact the probation officer, the parole officer? Is that how it was communicated back or not? Do you know? There's verbal and there was written. There was a fax of the polygraph report, and it's in the joint appendix. Okay. It went from the polygrapher to Mr. Flora and then to Virginia Department of Corrections. And, of course, Mr. Hall was aware of this whole thing from the very beginning. Why did it not be communicated through Mr. Hall? Why couldn't it just have been communicated directly from the clinic and the program to probation and then on to sentencing? I don't understand particularly why Mr. Hall was the medium of communication. I mean, this is a fairly alarming statement, to put it mildly. And so it would seem to be under the terms of the order that the treatment clinic would have had the right to have communicated. I mean, you know, somebody says they've assaulted 44 female minors and committed two murders. I don't understand why they were waiting for Mr. Hall to relay that information. And when you say relayed, who do you mean relayed to, Your Honor? To the federal government in this case? It would be perfectly permissible for the treatment under the terms of the order to say, you know, you need to understand this. This is what was said. Well, I think the counseling service is under contract with the Department of Corrections, and Mr. Hall is an employee of the Department of Corrections. So I think Mr. Flora— That doesn't answer the question. The question is why wasn't the communication direct— why wasn't it directly communicated from the treatment program to the DOC? Why did Mr. Hall have to serve as the intermediary? You're saying he didn't serve. You're saying there was a direct communication to VDOC from the program. Yes, Your Honor. I mean, Mr. Hall is a probation officer who is supervised by another probation officer, and Mr. Flora transmitted the written information from the polygraph to Virginia Department of Corrections directly, and it was shared within the office. How does Mr. Hall come into it? So Mr. Hall's role originally—Mr. Lora didn't have transportation to these events, so Mr. Hall, as the probation officer, drove Mr. Lora to the sex offender treatment program and to the polygraph. So he testified that he needed transportation, so that's why he was on site with Mr. Lora when he was participating in the sex offender treatment program. And I don't think he says this in his testimony, but by implication that normally the probationer would just go to the treatment without probation being involved directly. Well, did this get into the hands of probation via Mr. Hall or via the treatment program? I'm still not clear. It went from the treatment provider to Virginia Department of Corrections at their main office, and Mr. Hall was his probation officer, so he was— I got you. Okay. Unless the Court has any questions on the Fifth Amendment issue, then I'll stand on the arguments of my brief. Thank you, Your Honors. Thank you. Mr. Beezer? To answer your question about how did Mr. Hall get the information, I just wanted to clarify that on page 51 and 52 of the appendix, he stated that he took him to the polygraph, and although he didn't sit in on the polygraph, as soon as the polygraph was over, they called him because they wanted to make him aware of the statements that were made during the polygraph examination. So it wasn't casually that he became aware of it. They made a point of bringing him back to tell him about that. Judge Keenan, you asked how much overlap was there between, I think, the statements made in the polygraph examination and the statements made to Mr. Hall in the car. And I believe on page 53 of the appendix, Mr. Hall testified that he told him that he— Laura told Hall that he made the statements, and Hall said he never elaborated any more than what the statements were at the time of the polygraph. So— Thank you. Okay. That's all. All right. We thank you, sir. Thank you. And you're court-appointed, and I appreciate your services on behalf of your client. Thank you very much. We'd like to come down and shake hands with each of you, and then we'll move directly into our second case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Barbara Milano Keenan